

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

AP-75,793

ROOSEVELT SMITH, JR., Appellant

v.

THE STATE OF TEXAS

On Direct Appeal of
Case 1045419 of the 263rd Judicial District Court,
Harris County

*Per curiam.*

Roosevelt Smith, Jr. was convicted in June 2006 of capital murder.[1] Based on the

jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article

37.071, §§2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to

---

[1] TEX. PENAL CODE § 19.03(a).

[2] Art. 37.071§ 2(g). Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

this Court is automatic.[3] The appellant raises eleven points of error in this appeal, but he does not challenge the sufficiency of the evidence. After reviewing the appellant's points of error, we find them to be without merit and affirm the trial court's judgment and sentence of death.

## I. BACKGROUND

The appellant was convicted of intentionally murdering Betty Blair while in the course of committing a robbery.[4] The appellant was a Hurricane Katrina evacuee from New Orleans who had arrived in Harris County shortly after the storm. He, along with fellow evacuees Leona Walker, Jimmy Le, Stephanie Jacobo, and Le and Jacobo's 10-month-old infant, befriended Blair at the food pantry of St. Pius V Catholic Church, where the evacuees were seeking assistance.[5] Blair, a 77-year-old recent widow, volunteered at her church and took it upon herself to give additional assistance to a handful of individuals. Blair focused on assisting the appellant and his friends.

Blair gave the appellant, Le, Jacobo, and Le and Jacobo's baby some start-up necessities, such as food, a mattress, and bicycles for transportation. She provided them with information about obtaining their GEDs. And she allowed them to do laundry at her house in exchange for completing yard work around her home. The week before she was

---

[3] Art. 37.071 § 2(h).

[4] *See* TEX. PENAL CODE § 19.03(a)(2).

[5] Leona Walker was initially in the group of evacuees who was first helped by Blair; however, she was no longer involved with the appellant, Le, Jacobo, or the victim at the time of the offense.

killed, Blair drove the group around Pasadena to assist them in seeking employment.

Evidence from a pawn shop revealed that on two occasions in October 2005, prior to the instant offense, the appellant stole jewelry from Blair and pawned the items for cash. It appears that Blair was unaware of these thefts.

Additionally, the appellant's neighbor, Julio Covarrubias, testified that he had loaned the appellant $30. When he confronted the appellant about retrieving the money, the appellant stated that he was going to "pull a fucking lick" and would then repay him. Covarrubias testified that the appellant said that he was going to rob Blair because she's "got a lot of nice stuff."

Shortly after 5:30 p.m. on October 28, 2005, Blair arrived home to find the appellant, Le, and Jacobo, with the baby, waiting for her outside of her home. Jacobo asked Blair if they could go inside because Jacobo had a personal female issue to discuss with her. Blair readily admitted them into her home. While Jacobo was speaking with Blair, the appellant picked up a nearby glass-block candle holder and hit Blair on the head with it. Blair fell to the ground. The appellant then applied pressure to her throat with his knee. Next, the appellant and Le carried Blair to her bedroom, placed her face down on the bed, took off her pants, and used them to tie her arms behind her back. Blair was choked both by hand and with a cell-phone charger cord that was pulled so tightly around her neck that her skin folded over it. The appellant's DNA was found on the phone cord.

The appellant, Le, and Jacobo then stole numerous items, including jewelry, two

televisions, a computer, a camera, binoculars, a cell phone, and a piggy bank. They loaded the items into Blair's 2004 Buick LeSabre and fled the scene.

Blair's youngest daughter, Melissa Bishop, testified that she went to Blair's house shortly after 6:00 p.m. because her mother was not answering the phone. She discovered Blair's body and immediately called 911, alerting the police that Blair's car was equipped with the OnStar tracking device. The police were able to track the car through the OnStar system and the appellant, Le, and Jacobo were apprehended by 8:00 p.m. that evening in west Houston. The appellant was driving the car. The police arrested all three individuals and turned the infant over to Child Protective Services.

The appellant was charged on October 29, 2005 with capital murder. The indictment stated that the appellant "did then and there unlawfully, while in the course of committing and attempting to commit the robbery of Betty Blair, intentionally cause the death of Betty Blair by strangling the complainant with a deadly weapon, namely a cord."

## II. VIDEOTAPED STATEMENT

In the appellant's first four points of error, he contends that the trial court erred in overruling his motion to suppress his first videotaped statement.[6]

---

[6] The appellant's first point of error states, "Appellant's statement – made in immediate response to Detective Rogge's threat that unless he 'confessed' 'I'll get you the death penalty' – was involuntary and inadmissible as a matter of due process, because in the totality of circumstance, the threat was objectively so coercive in nature, as to overbear appellant's will."

The appellant's second point of error reads, "The same statement was also involuntary and inadmissible as a matter of state statutory law, because the detective's explicit threat was so inherently likely, in the circumstances, to induce him to speak untruthfully, as to make it unlikely that the statement was a product of his free and unfettered choice."

(continued...)

## A. Background

After his arrest, the appellant was taken to the Pasadena jail, where he was interrogated by Pasadena Police Detective Eddie Rogge. The interrogations were videotaped and broken into two interviews, with a break of approximately ten minutes between them. Rogge informed the appellant of his *Miranda*[7] rights on three separate occasions, two of which were videotaped at the start of each interview. On both videotaped interviews, the appellant acknowledged his rights and then proceeded to answer Rogge's questions. Yet, at the start of the second statement, there was a short time lag in which a small portion of the interview was lost. Rogge acknowledged that the ten minutes between the two statements were not videotaped. At the beginning of the second interview, Rogge again read the appellant his *Miranda* warnings; however, due to the time lapse and ten-minute break, some portions of conversation might have been lost. The second videotape begins with Rogge stating, "[B]ecause every time we do this I have to do [the *Miranda* warnings]," "For the third time I've read you your rights. You've asked for a lawyer; is that right? Are you requesting a lawyer at this time?" The appellant replied, "It's not going to stop me from answering your questions. I'm just here to answer your questions."

---

[6](...continued)
The appellant's third and fourth points of error collectively state, "The trial court committed reversible error in admitting appellant's statement which was obtained without a 'knowing, intelligent and voluntary waiver' of his Miranda rights, in violation of the bright-line rule of Miranda and Art.38.22, Sec. 3(a)(2), V.A.C.C.P. by his deliberate use of a procedure calculated to undermine those protections."

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966); *see also* Art. 38.22 § 3(a)(2).

The appellant filed a motion to suppress both videotaped statements. In the pre-trial hearing, the trial judge denied the motion to suppress the first statement, but granted the motion to suppress the second statement because it was in violation of *Miranda*. During the hearing, the trial judge focused primarily on the appellant's second videotaped statement, discussing the appellant's purported request for counsel prior to giving the statement. No testimony was elicited regarding the first statement, other than Rogge testifying generally that he gave the appellant his *Miranda* warnings twice before taking the first statement, that appellant acknowledged that he understood the warnings, and that neither Rogge nor anyone else coerced the appellant or promised him anything in exchange for the first statement. The suppression hearing covered scarcely any other complaints regarding error with respect to the first statement and Rogge's method and strategy in interrogation.

Nevertheless, before the state introduced the first statement at trial, the appellant again objected to the statement's admissibility, citing specific pages of a written transcript of the videotape that was not made part of the record. Again, the trial judge overruled the appellant's objections. Post-trial, the trial judge entered findings of fact and conclusions of law, in pertinent part, as follows:

FINDINGS OF FACT

3.      Once back at the Pasadena Police Department, Detective Rogge escorted [the appellant] to an interview room. While walking to the interview room,

Detective Rogge again[8] read [the appellant] his rights under [Article] 38.22 of the Texas Code of Criminal Procedure. At this time, [the appellant] agreed to waive his rights and speak to Detective Rogge.

4. Detective Rogge then placed [the appellant] in an interview room at the Pasadena Police Department and a video recording was started to record [the appellant's] statement. Once Detective Rogge entered the room, he again read [the appellant] his rights under [Article 38.22] on the video recording. On this recording, [the appellant] indicated that he understood each of his rights and began to voluntarily speak with Detective Rogge.

5. No force, promises, threats or intimidation were used by police authorities either before or during the taking of [the appellant's] statement nor does [the appellant] appear to be under the influence of any intoxicant. [The appellant] appears to be fully aware of his surroundings and competent to understand the nature of his situation.

CONCLUSIONS OF LAW

2. [The appellant] was given his statutory rights under [Article] 38.22 of the Texas Code of Criminal Procedure at least 3 times prior to the taking of his first statement. The third time the [appellant] was given his statutory rights under [Article] 38.22 of the Texas Code of Criminal Procedure, it was recorded on video along with his first statement. [The appellant] understood these statutory rights and freely and voluntarily waived these rights, providing Detective Rogge with a video recorded statement.

3. This video recorded statement of [the appellant] was taken by Pasadena Police Detective E. Rogge in accordance with [Article] 38.22 of the Texas Code of Criminal Procedure. Further, the taking of said statement did not violate [the appellant's] rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Art. 1, Sec. 10 of the Texas Constitution.

The appellant now argues that his "confession was not voluntary and was the result of the promises and other coercive actions of law enforcement officers." Specifically, he

---

[8]The trial court found that Rogge had first read appellant his Article 38.22 rights at the scene of the arrest. The record does not support this finding as Rogge testified that he did not speak to the appellant until after he was transported to the Pasadena police station. Finding no. 3 actually sets out the first time Rogge read the appellant his rights. This unsupported finding, however, does not affect the final disposition of the appellant's points of error.

complains that the first videotaped statement was taken in violation of his Fifth and Fourteenth Amendment constitutional rights, as well as in violation of Articles 38.21 and 38.22.

## B. *Miranda*

In his third and fourth points of error, the appellant contends that his first video confession was obtained in violation of *Miranda*[9] and Article 38.22 § 3(a)(2), because he did not knowingly, intelligently, and voluntarily waive his rights. Specifically, he claims that the police procedure used in this case was calculated to undermine the protections provided by Article 38.22 and *Miranda*.[10]

The appellant concedes that Rogge properly gave him the required constitutional and statutory warnings and that he did acknowledge each of them. Indeed, the videotaped interview indicates that Rogge offered to explain the warnings if the appellant did not understand them. The appellant now argues, however, that the interrogation was erroneous because there is no evidence that he *explicitly* waived his rights.

### 1. Established Law

Article 38.22 §3(a)(2) requires that an oral statement resulting from custodial interrogation must contain a warning informing the defendant of his rights,[11] and that

---

[9] *Miranda*, 384 U.S., at 436.

[10] *Id.*

[11] Article 38.22 § 2 (a) requires that an accused receive the following warnings: (1) he has the right to remain silent and not make any statements, (2) any statements he makes may be used against him in court, (3) he has

(continued...)

there be a knowing, intelligent, and voluntary waiver of those rights. This waiver of rights may be inferred from the actions or words of the person being interrogated.[12] "A waiver may be found in an express written or oral statement or, in at least some cases, may be inferred from the actions and words of the person interrogated."[13] As this Court stated in *Barefield*, "[w]e do not . . . interpret the oral confession statute to require an express verbal statement from an accused that he waives his rights prior to giving the statement."[14] We look to the totality of the circumstances when determining voluntariness of the waiver.[15]

## 2. Application

The appellant argues that our holding in *Garcia v. State*[16] requires explicit waiver language beyond the defendant's acknowledgment that he understands his rights and his voluntariness in continuing the interview. In *Garcia*, this Court held that a written confession was admissible despite the absence of an explicit oral or written waiver. We explained that a waiver could be inferred from the language contained in the written

---

[11](...continued)
the right to have a lawyer present to advise him before and during the questioning, (4) if unable to employ a lawyer, he has the right to have a court-appointed lawyer, and (5) he has the right to terminate the interview at any time. *See also Miranda*, 384 U.S., at 436.

[12] *Barefield v. State*, 784 S.W.2d 38, 40-41 (Tex. Cr. App. 1989).

[13] *Mays v. State*, 726 S.W.2d 937, 946 (Tex. Cr. App. 1986).

[14] *Barefield*, 784 S.W.2d, at 40-41.

[15] *Id.*; *see also Berry v. State*, 582 S.W.2d 463, 465 (Tex. Cr. App. 1979).

[16] 919 S.W.2d 370, 385-87 (Tex. Cr. App. 1996).

statement itself.[17] The appellant contends that our reliance on the language described in *Garcia* indicates that we now require additional language on the part of the accused in an oral confession as well. The appellant reads *Garcia* too broadly for it to apply in this case.

In *Garcia,* this Court analyzed the totality of the circumstances surrounding the defendant's *written* statement. In *Garcia*, we found that there were sufficient indications that the defendant had waived his rights and had voluntarily given his statement, based in part on the language of the document. Specifically, we noted that the warnings appeared multiple times on the face of the document, the defendant had initialed them on each page of the statement, and he had signed a sentence on each page reciting that he had read the statement.[18] *Garcia* did not overrule or modify *Barefield* in any way, and it did not discuss the symbiotic nuances of an oral waiver of rights.

In the instant case, the trial judge, after viewing the videotaped statement and conducting a hearing on the motion to suppress, concluded that the appellant evidenced an understanding of his rights and that he knowingly and voluntarily waived them. The findings of fact and conclusions of law support the record and reflect this reality.

In the first videotaped statement, the appellant indicated to Rogge that he understood each right as it was read to him. He repeatedly acknowledged Rogge's statements and was vocal in his responses in the affirmative. Then, without hesitation, the

---

[17] *Id.,* at 385-86.

[18] *Id.,* at 386.

appellant proceeded to discuss the case with Rogge. The interview lasted approximately one hour, which included the *Miranda* warnings at the onset. As noted during the suppression hearing, the appellant mentioned his right to counsel following his first statement, and before his second. This invocation of his right to counsel further demonstrates that the appellant understood his rights and voluntarily waived them when he gave the first statement. Simply because Rogge informed him of the nature of the charges and the gravity of his pending charges, does not indicate a threat so egregious that it trampled the appellant's constitutional protections. Rogge complied with Article 38.22 and with *Miranda*, sufficiently warning the appellant of his rights. The appellant clearly waived his rights and voluntarily confessed, and as a result, we find that the trial court did not err in overruling the appellant's motion to suppress his first statement. Points of error three and four are overruled.

## B. Government Coercion

In points of error one and two, the appellant argues that the trial court erred by denying his motion to suppress his first videotaped statement because it was involuntary due to Rogge's coercive interrogation. He claims that his rights were violated under Articles 38.21 and 38.22 § 6, and under the Fifth and Fourteenth Amendments to the United States Constitution.[19]

---

[19] The appellant's second point of error is based on Texas law, while his first is based on the federal protections of due process under the Fifth and Fourteenth Amendments of the United States Constitution. He argues them together in his brief, without distinguishing the state and federal claims, and so we shall also address them

(continued...)

The appellant contends that, during the first videotaped interrogation, Rogge made several comments that prove he promised the appellant that he would not be charged with capital murder if he confessed, and that this amounts to impermissible coercion. The videotape shows that, after several minutes of questioning in which the appellant stated that he, Le, and Jacobo went to burglarize Blair's home and steal her car, the following conversation took place:

Appellant: Let me ask you something. What are we charged with?
Rogge: At this exact moment - nothing. Nothing.
Appellant: Nothing?
Rogge: Not right this minute. Do you want to know what you're going to be filed on for?
Appellant: Yes, sir.
Rogge: Capital murder.
Appellant: Huh?
Rogge: Capital murder.
Appellant: How?
Rogge: Because I'm going to show you how it's done. And what I'm going to do for you is let you help yourself. You can either be . . . stonewall me, and lie to me where I can prove you're lying to me and I'll get you the death penalty or you can tell me the truth and help yourself. Cause you fucked up. And [Le] fucked up, and [Jacobo] fucked up. I'm just talking straight with you.
Appellant: O.K.
Rogge: And the only person who can help you right now is you. I'm not blowing smoke up your butt or anything. Talking straight with you. You're [*sic*] lying to me and stuff ain't going to help. I want to know the truth. Now tell me the truth. I know what happened. We have evidence. We have witnesses. I have other statements. Now if you want to screw yourself, lie to me. Or you can tell me the truth.
Appellant: Capital murder. Lord have mercy. I'll never see my son again. Ever.

---

[19](...continued)
together.

Yes, sir. This is the best I can help myself now.

Rogge: And that's it. Just tell me the truth and get right with God.

\* \* \*

Rogge: That's all I'm asking. Do you know what this depends on? If you're going to get life or the needle. It's that simple. And again, the only person that can help you . . . We know what happened. We have the evidence there. We got everything there is. And this is your chance to help yourself.

The appellant subsequently confessed to his involvement in the murder, but still contended that Le was the one who choked Blair. He now argues that the included portions of the first statement amounted to impermissible government coercion and is reversible error.

### 1. Established Law

In reviewing a trial court's ruling on a motion to suppress, the appellate court views the evidence in the light most favorable to the trial court's ruling.[20] "When a trial court makes explicit fact findings, the appellate court determines whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings. The appellate court then reviews the trial court's legal ruling *de novo* unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling."[21] "If the trial court's findings of fact are supported by the record, an appellate court is not at liberty to disturb them, and on appellate review, we address only the

---

[20] *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Cr. App. 2006).

[21] *Id.,* at 818.

question of whether the trial court improperly applied the law to the facts."[22]

Article 38.21 provides that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." Under federal due process principles, a statement is involuntary if the defendant was offered inducements of such a nature, or coerced to such a degree that the inducements or coercion produced the statement – not the defendant's free will.[23] "There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concerns of the Fifth Amendment, on which Miranda was based, is *government coercion*."[24] The determination of whether a statement is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition.[25] This review must be completed in light of the arguments, information, and evidence that was available to the trial court at the time of its ruling.[26]

## 2. Application

The appellant proffers no persuasive argument or authority that his confession was

---

[22] *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Cr. App. 1990).

[23] *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986).

[24] *Id.* (emphasis added).

[25] *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Cr. App. 1995); *see also Griffin v. State*, 765 S.W.2d 422, 429 (Tex. Cr. App. 1989).

[26] *See Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Cr. App. 2003) ("As a general rule, an appellate court reviewing a trial court's ruling on the admission or exclusion of evidence must do so in light of the arguments, information, and evidence that was available to the trial court at the time it ruled.").

not voluntarily given, and our review of the record reveals no evidence showing that his statement was not voluntary. In fact, no argument was ever made to the trial court, either during the motion to suppress hearing or during the guilt and innocence portion of the trial, regarding the specific remarks complained of on appeal.[27] Rather, the appellant relies almost exclusively on the fact that Rogge informed him of the nature of the purported charge and of its punishment, claiming that when Rogge urged the appellant to "be straight with [him]" in order to help himself, that those statements rose to the level of police coercion. We disagree.

The appellant was apprehended at approximately 9:10 p.m. and questioned several hours later at approximately 2:10 a.m. The time frame was not unreasonably long to wait for interrogation, and the reason he was not questioned immediately upon arrest is that Rogge first ensured that the stolen vehicle in which the appellant was apprehended was properly transported and locked in a secure location, and then he questioned Le and Jacobo prior to questioning the appellant. These combined reasons pushed the appellant's interview back to 2:10 a.m.

In looking at the totality of the circumstances,[28] we observe that the appellant (1) was read his *Miranda* warnings, (2) acknowledged his rights on the record, (3) agreed to

---

[27] The only argument made with any specificity occurred during trial when the appellant again presented his objection. Yet, he only cited to three page numbers from a written transcript that was never made part of the record. He did not make a record of what was on those pages. Therefore, we do not know if the appellant's complaint at trial even comports with his complaint on appeal. Nevertheless, in the interest of justice, we shall address the claim.

[28] *Penry*, 903 S.W.2d, at 744.

continue speaking with Rogge, (4) freely offered information pertaining to the offense, (5) was seated the full time, mostly with his hands folded over his chest, (6) was not handcuffed during the course of the interview, (7) was not physically touched by Rogge or any other police officer during the course of the interview, (8) was permitted time to ask questions of his own, and (9) was not prohibited from stopping the interview at any time. Despite this, the appellant still contends that he was coerced into confessing out of a fear of the death penalty. Yet not once during the interview did the appellant stand up and try to leave, only to be met by force or coercion. Not once during the interview did the appellant appear to be forced into submission. When Rogge asked the appellant questions regarding his relationship with the victim and the co-defendants, about his activities on the day of the offense, and about the specific nature of the offense, the appellant freely offered responses.

Rogge's statements, which the appellant deems a threat, "offensive to due process, and [*sic*] draws a line the police may never cross, not even with a suspect who has been warned and has expressed a willingness to speak to them," do not affirmatively promise that the appellant would not get the death penalty if he confessed. At best, the comments convey the understanding that the appellant would most likely get the death penalty if he were found to be lying; if he told the truth, he would have a chance at a life sentence.[29]

---

[29] *Compare Sherman v. State*, 532 S.W.2d 634 (Tex. Cr. App. 1976) (confession found involuntary when uncontroverted evidence showed that the defendant would not have signed his confession but for the fact the officer convinced him that he would get the death penalty if he did not), *with Bonham v. State*, 680 S.W.2d 815, 821 (Tex. Cr. App. 1984) (confession admitted because there was evidence that the defendant's statement was voluntary even

(continued...)

When the appellant stated that he was trying to cooperate with Detective Rogge because it was "probably" the only thing that would save him from the death penalty, his statement did not inherently mean that he was being offered a deal with the police for a life sentence. In fact, when the appellant testified at the suppression hearing, he did not even say that Rogge had promised him anything or that he felt coerced to make his statement.[30] He offers nothing new to this Court to combat his prior statement.

The record, viewed in the light most favorable to the trial court's ruling, supports the finding that no force, promises, threats or intimidation were used to obtain the appellant's statement. The trial court did not err in denying appellant's motion to suppress. Points of error one and two are overruled.

### D. Instruction of the Voluntariness of Confession

In his fifth point of error, the appellant complains that the trial court erred in failing to instruct the jury on the voluntariness of his confession as required by Article 38.22, § 6. The appellant cites our opinion in *Oursbourn v. State*[31] for the proposition that the trial court was obligated to provide a jury instruction because the voluntariness of his confession was litigated at the suppression hearing.

---

[29](...continued)
though officer told defendant that he would get the death penalty if he did not make a statement).

[30] *See generally Bonham*, 680 S.W.2d, at 821 (where the appellant litigated the issue of voluntariness at trial, in contrast to the instant case, where the appellant never even objected to the issue until appeal).

[31] 259 S.W.3d 159 (Tex. Cr. App. 2008).

## 1. Established Law

To preserve an error for appeal, an appellant must make a timely complaint that states the grounds for the objection with "sufficient specificity to make the trial court aware of the complaint," and the trial court must rule or refuse to rule on the objection.[32] Nevertheless, an appellant may still complain of jury-charge error for the first time on appeal.[33] Under *Almanza*, an appellant who complains of an unobjected-to error in the charge on appeal is entitled to reversal if he can show the error caused him "egregious harm."[34]

The Code of Criminal Procedure provides further instruction for the issue of voluntariness. Under Article 38.22, § 6, following a finding of voluntariness by the trial court at a suppression hearing, a defendant still may offer evidence before the jury suggesting that the confession was not voluntary.[35] If a defendant offers such evidence,

---

[32] TEX. R. APP. PROC. 33.1.

[33] *Almanza v. State*, 686 S.W.2d 157 (Tex. Cr. App. 1985).

[34] *Id.,* at 171 ("[I]f no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial' -- in short 'egregious harm.'").

[35] Article 38.22 § 6 reads in its entirety:

"In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any

(continued...)

the trial court is obligated to provide a jury instruction on voluntariness.[36] Conversely, if no evidence of involuntariness is presented, no instruction is required.[37]

## 2. Application

In the instant case, the appellant did not object to the jury charge at trial. While his lack of objection does not prohibit relief, it does subject him to an "egregious harm" analysis under *Almanza.* The appellant, however, does not focus his argument on "egregious harm" for this issue. Instead, he relies on our opinion in *Oursborne*, which stands for the broad proposition that if an issue of voluntariness is litigated, then the appellant is entitled to a jury instruction on voluntariness.

This argument does not meet the high burden of "egregious harm." To prove "egregious arm," the appellant, again, relies on his contentions in points of error one and two that the police coerced him into confessing. This argument is neither developed nor persuasive, proffering no new evidence or case law to dispute the trial court's findings.[38]

---

[35](...continued)
case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings."

[36] *Oursbourn*, 259 S.W.3d, at 175.

[37] *Id.*, at 165 ("[W]hen the evidence raises an issue of the 'voluntariness' of a defendant's statement under Article 38.22, the trial judge must give a general voluntariness instruction under Sections 6 and 7 of that article because it is the 'law applicable to the case.' But when the defendant does not request this statutorily mandated instruction, the trial court's failure to include it is reviewed only for 'egregious harm' under *Almanza*.").

[38] *Almanza*, 686 S.W.2d, at 171 ("[I]f no proper objection was made at trial and the accused must claim that

(continued...)

Since we find no egregious error in the jury charge on voluntariness, point of error five is overruled.

## III. *BATSON* CHALLENGES

In his sixth and seventh points of error, the appellant claims that the trial court erred in overruling his *Batson*[39] challenges regarding two African-American venire members: Staci Traylor and Yolanda Branch. The appellant objected to the State's peremptory strikes for these venire members, claiming they were racially motivated. The trial court held a *Batson* hearing in which the prosecutors testified as to their race-neutral reasons for exercising the peremptory strikes. The trial court found that the State did not strike the respective venire members on the basis of race and overruled each of the appellant's challenges, ultimately seating a jury with no African-American jurors. Although no African-Americans served on the jury, we do not know how many of the venire members were African-American.

### A. Established Law

In *Batson v. Kentucky,* the United States Supreme Court held that discrimination on the basis of race during jury selection violates the Fourteenth Amendment.[40] Motivated by a need to eliminate racial prejudice from peremptory strikes, the *Batson* court devised

---

[38](...continued)
the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial' -- in short 'egregious harm.'").

[39] *Batson v. Kentucky*, 476 U.S. 79 (1986); *see also* Art. 35.261.

[40] 476 U.S., at 88.

a three-part test to determine whether purposeful racial discrimination was employed in voir dire procedures.[41] *Batson* and its progeny require: (1) the defendant to first establish a *prima facie* case that the State exercised its peremptory strikes in a discriminatory manner; (2) the prosecutors to next offer race-neutral explanations for their use of peremptory strikes; and (3) the trial court to ultimately determine whether there was purposeful discrimination.[42] "At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[43] We review the record of a *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling.[44] "The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous."[45]

When making its *Batson* finding, the trial court "should consider all relevant circumstances"[46] and will review "all of the circumstances that bear upon the issue of racial animosity."[47] These circumstances may include "a 'pattern' of strikes against black jurors included in the particular venire [which] might give rise to an inference of

---

[41] *Id.,* at 94-98.

[42] *Batson,* 476 U.S.,at 96-97; *see also Miller-El v. Dretke*, 545 U.S. 231, 267 (2005) (Breyer, J., concurring).

[43] *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

[44] *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Cr. App. 1992); *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Cr. App. 1992).

[45] *Williams v. State*, No. 1088181 2009 LEXIS 1751, *24 (Tex. Cr. App. Dec. 16, 2009).

[46] *Batson*, 476 U.S., at 96.

[47] *Snyder v. Louisiana*, 552 U.S. 472 (2008); *Miller-El*, 545 U.S., at 239.

discrimination."[48] They may also include the number of peremptory strikes used on minority jurors, the make-up of the venire, comparisons with other venire members' responses,[49] as well as the plausibility of the prosecutor's explanation for the peremptory strike.[50] We look to United States Supreme Court precedent for guidance in determining the propriety of the trial court's *Batson* rulings.

In *Miller-El v. Dretke*, the United States Supreme Court stated that statistics of the amount of black venire persons struck from a panel, as well as comparisons between black and non-black venire persons may be considered as evidence of purposeful discrimination in a *Batson* challenge.[51] The Court determined this by looking at the makeup of the venire panel: on a 108-person panel, nine out of 20 African-American venire members were excused for cause or by agreement, while 10 were peremptorily struck by the State.[52] These statistics reveal that the State used two-thirds of its peremptory strikes to exclude 91% of the eligible African-American venire persons, which the Court found to be a compelling factor in its finding of racial discrimination.[53]

---

[48] *Batson*, 476 U.S., at 97.

[49] *See Miller-El*, 545 U.S., at 241.

[50] *Snyder*, 552 U.S., at 485-86.

[51] *See Miller-El*, 545 U.S., at 241.

[52] *Id.*, at 240-41.

[53] *Id.,* at 241, quoting *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . . Happenstance is unlikely to produce this disparity.").

Moreover, the Court looked at a side-by-side comparison of the black venire members who were struck with the white venire members who were allowed to serve on the jury, citing the disparity in treatment as "evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."[54] The Court further stated that the comparative evidence was even "more powerful than these bare statistics."[55]

In *Snyder v. Louisiana*, the United States Supreme Court found that the trial court erroneously rejected a *Batson* objection for a black venire member, based on the "[t]he implausibility of the prosecutor's explanation" for the strike.[56] The prosecutors questioned a venire panel of 85 members, challenging all but 36 individuals for cause.[57] Five of the remaining 36 were black and all five of these persons were peremptorily struck by the State.[58] The prosecutor explained that he struck Jeffrey Brooks, one of the African-American venire persons, because Brooks had voiced a concern about missing some college work. The State reasoned that, in order to shorten his jury service, Brooks would "come back with guilty of a lesser verdict so there wouldn't be a penalty phase."[59] The Court rejected this argument, finding the racially-neutral explanation proffered by the

---

[54] *Miller-El*, 545 U.S., at 241.

[55] *Id.*

[56] *Snyder*, 552 U.S., at 485-86.

[57] *Id.*, at 475-76.

[58] *Id.*

[59] *Id.*, at 478.

State to be unconvincing. It noted first, that after being contacted by the court clerk, an administrator at Brooks' school stated that his jury service would not be a problem; and, second, that the State accepted, without question, white jurors who also disclosed conflicting obligations that were at least as serious as Brooks'.[60] As a result, the State's peremptory strike was determined to be race-based in violation of *Batson*.[61]

We now turn to the two *Batson* strikes in the instant case. We need not address the first prong of the *Batson* test to determine whether the appellant established a *prima facie* case for two reasons. First, both objections were preserved properly in the record. Second, the issue of a *prima facie* case became moot once the prosecutor articulated his reasons for the challenged peremptory strike and the trial court ruled on the ultimate question of intentional discrimination.[62] The prosecutor then proffered race-neutral explanations for both strikes, satisfying the second prong of the *Batson* challenge. This analysis, therefore, will focus on a review of the trial court's decision in rejecting the *Batson* objections to venire members Staci Traylor and Yolanda Branch.

## B. Staci Traylor

In point of error six, the appellant argues that juror number 170, Staci Traylor, was improperly struck from the venire panel. The venire panel began with 209 individuals,

---

[60] *Id.*, at 482-84.

[61] *Id.*, at 485.

[62] *Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot.").

and by the time Traylor was questioned, the defense had peremptorily struck 17 venire members while the State struck 11.[63] While two of the State's 11 peremptory strikes were used on African-Americans, Traylor was the first African-American venire person to be peremptorily struck from the panel.[64] Traylor's answers on her juror questionnaire revealed that she had previously been opposed to the death penalty. She confirmed this belief during voir dire, and further explained her position by stating that she felt uncomfortable and would lose sleep over making a decision in a death case. She said on voir dire, "I would answer the questions truthfully, but I would sometimes think about the consequences of answering the questions truthfully. That's the part that would probably keep me up at night." She also said, however, that she believed that there were appropriate cases for the death penalty and that she would be able to follow the law and base her decisions on the evidence.

At the end of questioning, the State expressed its desire to use its eighth peremptory strike against Traylor. The defense immediately made a *Batson* challenge:

[Defense]:   And Judge, we'd like a Batson objection. Basically, she answered all the questions like everybody else, African-American like the defendant, his same race.

[Court]:   All right. From the State, please.

---

[63] We have no information in the record before us to determine whether the defense exercised any of its peremptory strikes against African-Americans. We recognize from the record, however, that 159 venire persons were struck for cause or by agreement by both sides.

[64] Yolanda Branch, venire member 179, was the second African-American to be peremptorily struck from the panel. We will address Branch following the discussion of Traylor.

[State]:     Your Honor, from the State, as you heard the juror respond to the questions and also in the questionnaire, it's her opinion that the death penalty is cruel and unusual punishment. She made a series of answers in her questionnaire that she has a prior opposition to the death penalty. She feels that the death penalty is cruel and unusual punishment. She feels that the death penalty should be or that – that she, as she testified to as she – when she was on the stand that she would have a lot of difficulty in the jury room answering those questions according to the law and the evidence knowing that the result would be the death penalty. She said that she would honestly do that, but that it would be extremely difficult for her.

[Court]:     Those are race neutral. And so we'll strike her, the State will. I will strike and I think that's [*sic*] State's got quite a few left.

The appellant now contends that the Court improperly excused Traylor from the panel "without addressing the matters raised by the Defense or stating that he had considered whether the reasons submitted by the State were a device to mask discrimination." The appellant's argument is premised on the presumption that, because Traylor "answered the questions like everyone else," the reasons proffered by the State must be racially-motivated.

We will review the trial court's decision based on what the trial court knew when overruling the objection. By the time Traylor was questioned, nine jurors had been selected. None of these jurors had any stated opposition to the death penalty.[65] In contrast, of the State's seven prior peremptory strikes, four answered their questionnaires exactly like Traylor. They stated that they had previously been opposed to the death penalty or

---

[65] We note that four of the selected jurors had answers on their questionnaires stating that they had either previously been opposed to the death penalty, thought it to be uncivilized, or thought it was wrong but necessary. Each of these jurors explained on voir dire, however, that they had accidentally marked the wrong answer on the questionnaire or explained that they had been thinking only of a particular fact pattern. Each of them also stated that they were comfortable sitting on a capital jury that must consider the death penalty.

had other problems with it. These same venire members each said, similar to Traylor, that they could set their views aside and decide the case based upon the law and facts. The State used its other three peremptories on an attorney, a venire person who had work conflicts, and a venire person who had trouble understanding the burden of proof. The appellant suggests that some black venire persons were dismissed by agreement is evidence that the State violated *Batson*. We do not agree. The defense is equally responsible for the removal of those venire persons from the panel and cannot later complain that their removal resulted from any alleged purposeful discrimination on the State's part.[66]

We find that the State did not single Traylor out from the other venire persons on the basis of her race. The record before us corroborates the trial court's ruling that the State's peremptory strike of Traylor was race-neutral. There were no "implausible" explanations provided by the prosecutor that would lead the trial court to question the motivation behind the peremptory strike.[67] The trial court believed the race-neutral reasons for striking Traylor from the panel, and we see no error in the ruling.

Nevertheless, despite the fact that the record supports the plausibility of the State's race-neutral explanation, we shall present a side-by-side analysis of the two venire members that the appellant compares: Traylor and venire member 173, Stephanie French.

---

[66] *Miller-El*, 545 U.S., at 269, *citing Georgia v. McCollum*, 505 U.S. 42 (1992) ("[T]he Court has widened and deepened *Batson*'s basic constitutional rule. It has applied *Batson*'s antidiscrimination test to the use of peremptories by criminal defendants.").

[67] *See Purkett*, 514 U.S., at 768; *Snyder*, 552 U.S., at 485-86

The State questioned both venire members at length, regarding their general opinions surrounding the death penalty. The State then discussed the enumerated offenses described in the legislature's definition of capital murder. And finally, the State questioned the venire members about the three special issues regarding punishment, discussing them at length until both venire members responded with understanding.[68] The State also passed each witness to the defense for questioning, and it was the defense who did not question Traylor regarding her opinion. From the record, we note that French answered, "of course, yes," to numerous questions regarding her ability to impose the death penalty, where Traylor vacillated on similar questions.

The appellant's argument, which focuses on the comparison of Traylor with French, does not show disparate treatment, nor does it indicate racial discrimination. The comparison between Traylor and French was not possible at the time of this *Batson* challenge because French had not yet been questioned. Thus, even in a side-by-side comparison of the two, we agree with the trial court's determination of race neutrality in the State's explanation. We note that, in his brief, the appellant appears to argue – not that Traylor was peremptorily struck on the basis of race in comparison to venire member 173, Stephanie French – but rather that Traylor would have been a superior juror to French. This, quite simply, is not a matter of review for this Court. The responsibility of selecting

---

[68] While both Traylor and French are female venire members, Ms. McAnulty, a female prosecutor questioned Traylor on voir dire, while Mr. Hart, a male prosecutor questioned French. Other than the gender differences between the two prosecutors, this Court does not glean any difference in treatment in questioning or demeanor between Traylor and French's experiences.

a jury by conducting voir dire lies within the discretion of the parties.[69] When that

discretion is based on "racial animosity,"[70] the Court will intervene.[71] In this case, the trial

court found that the prosecutor's race-neutral explanation for venire member Traylor was

sufficient, and we agree.

## C. Yolanda Branch

In his seventh point of error, the appellant alleges that the State peremptorily

struck juror number 179, Yolanda Branch, on the basis of race. Branch was questioned

after both Traylor and French, when the State had one peremptory strike remaining.

Following questioning by both parties, the State moved to use its last peremptory strike

against Branch. Portions of the transcript reveal the *Batson* challenge that followed:

[Defense]:  Judge, at this time we would lodge a *Batson* objection indicating, again, the venireman just excused by the State is African-American, as is [appellant]. That the questionnaire and the answers been given by [Branch], No. 179, is in – comports with the questionnaire, almost mirrors the answers given by the white female, No. 173, that was accepted, that being Stephanie French that was accepted by the State. And so that, just like in 170, [Traylor], and then 179; the only difference is that [French] is a white female, [Traylor] and [Branch] happen to be black females.

And I am offering as part of the record for the voir dire what's marked as Defendant's Exhibits 1, 2 and 3 voir dire, the questionnaires of [Traylor], [French], and [Branch].

That concludes our *Batson*.

---

[69] *See* Art. 35.17 § 1.

[70] *Snyder*, 552 U.S., at 478.

[71] *See* Art. 35.17 § 1.

[Court]:       And from the State, please.

[State]:       Your Honor, as to the State, as it relates to the questionnaire of Branch, you'll note in her response to the questions on Page 10 she indicates, I do not believe in capital punishment, which is Question No. 9. That is, I do not believe, and if you'll notice Ms. French's questionnaire, she did not check No. 9 that she agrees, I do not believe in capital painment.

As to the other race neutral reasons, Your Honor, French [*sic*][72] indicates on her questionnaire that she believes the criminal laws are too harsh, response to Question No. 69. She also believes in response to Question 82, that the death penalty is used too often. As it relates to Question No. 81, she wrote N/A, not applicable in response to the question: The purpose . . . the death penalty serves in society. I asked her what purpose she believed the death penalty served, if she could think of any in favor, any arguments in favor of the death penalty and she stated none. She also indicates on her questionnaire as her argument against the death penalty that no one has the right to take a life. Additionally, Questions No. 50 and 51 – 50 being why people commit violent crimes, she's checked not applicable. 51, what makes a person dangerous, also no response with the N/A, not applicable. Feelings on the criminal justice system, Question No. 65, also checked not applicable.

In addition, [Branch], stated that she is opposed to the death penalty and that she would favor life without parole and would shade her answers in such a way to get the result that she favors, life without parole.

[Defense]:     May I respond, Judge?

[Court]:       Briefly.

[Defense]:     Yes, sir. If you look at the totality of the circumstances, we now have 10 white jurors. Every African-American that has taken the witness stand has either been struck for cause by the State or they have been used or the State has used a peremptory on those African-Americans. In addition, as we have opted to excuse some business agreements where the defense will offer up 5, 3, and those type people and traded them off, the State has offered up each time those other African-Americans, whoever answered the

_____

[72] From our understanding of the record, the prosecutor meant to refer to Branch.

> questionnaires from their perspective and so they have traded African-American males and females in the trade process.
>
> So, when you take the totality of the circumstances and you focus in on not only this woman here, [Branch] and [Traylor], it is clearly – the M.O. is, make sure we get no African-Americans on this panel. And that's where we are and that's where it stands.

[Court]:      I find the issue is race neutral and she will be excused as a strike by the State.

The appellant now argues that "the record does not fit the prosecutor's explanations." He contends that, while the State's reasons are indeed race-neutral, they do not explain what transpired during voir dire. At trial, the appellant specifically claimed that Branch's questionnaire "mirrors the answers given by the white female," selected-juror French. In comparing the two questionnaires, we find this claim is not supported by the record. The differences are highlighted by the State in its above response, with the most glaring distinction reflected in each woman's opinion of the death penalty.

When asked to choose the statement on the questionnaire that best summarizes their general view on capital punishment, French selected "I am neither generally opposed nor generally in favor of the death penalty for capital murder," while Branch chose "I am opposed to the death penalty for capital murder except in a few cases where it may be appropriate." French agreed with the statement, "Capital punishment is absolutely justified," while Branch disagreed with the same statement. French also agreed with the statement that "We must have capital punishment for some crimes," while Branch, again, disagreed. The State asserted that it was Branch's opinion on the death penalty that gave

reason for her strike. As a result, the appellant's contention that both questionnaires are the same fails.

Although the two venire members' questionnaires were similar, they were not identical. Nor were their responses during voir dire. Even if compared side-to-side, Branch and French did not give identical responses during voir dire. Branch wavered on her opinion of the death penalty and when to apply it, while French did not. When discussing punishment, Branch stated that she would "shade [her] answers in a way that would result in life without parole, rather than death," while French would be able to be involved in the process of judging punishment, stating, "I mean, if that's–that's the way that it's going to be, of course, yes." The mere fact that the two venire members possess similar characteristics, save their race, does not imply that they received disparate treatment. Their answers do reveal differences in their attitude toward the death penalty.

The appellant also argues, relying on *Miller-El*, that the totality of the circumstances in the instant case reveals a particular environment of racial discrimination.[73] Here, the inference of race-based discrimination, as expressed in *Miller-El*, does not apply to either venire member Staci Traylor or Yolanda Branch. Although the jury was sworn in with no black jurors, there was no evidence here of a systematic policy

---

[73] *Miller-El*, 545 U.S., at 306 (the "environment" of racial discrimination was based on a DA manual written in 1968, in which prosecutors were instructed to strike black jurors).

to exclude African-Americans, as was the case in *Miller-El.*[74] The State offered race-neutral reasons for its peremptory strikes of Traylor and Branch that, as shown by a thorough review of the record, were not merely pretexts for purposeful discrimination. Additionally, the explanations provided by the State were plausible to the trial court, and are plausible to this Court. The State took care in questioning and treating all of the prospective jurors consistently. Viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court's rulings on the peremptory strikes of Traylor and Branch were clearly erroneous. Therefore, points of error six and seven are overruled.[75]

## IV. AUTOPSY PHOTOGRAPHS

In his eleventh point of error, the appellant complains that the trial court erred in admitting nineteen autopsy photographs of the victim into evidence at the guilt phase of

---

[74] On appeal, the appellant alleges that there "was an environment of racial hatred of blacks that existed in Pasadena." This argument is in sharp contrast to the environment in the Dallas County District Attorney's Office, in which prosecutors were trained with a manual to racially discriminate against African-Americans. Here, the appellant presented no compelling evidence of any kind signifying an environment of racial hostility to the trial court, nor does he present any to this Court.

[75] The appellant requests that this Court remand his case for explicit findings as to whether the State's specific reasons were race-based under *Guzman v. State*, 85 S.W.3d 242, 254-55 (Tex. Cr. App. 2002). This remedy is not necessary. Here, the trial court specifically ruled that the State's reasons for striking both Traylor and Branch were not race-based. In *Guzman*, we remanded the case for further findings because, while the *Batson* challenge and ruling at trial regarded a race-based strike, the challenge on appeal was that the State's strike was a gender-based violation of *Batson,* and one of the race-neutral reasons the State gave was that the venire person was male. The trial court had not ruled on whether the State would have struck the venire person regardless of his gender, and we required a finding on that issue. *Guzman* does not hold that a trial court is required to address the plausibility of each reason given by the State in detail, nor do we find any other authority to so hold.

trial.[76] Specifically, he alleges that the prejudicial nature of the photographs substantially outweighed their probative value because the photographs were gruesome and needlessly cumulative.[77] At trial, however, the appellant did not object to the gruesomeness of the photographs – he complained only of their cumulative nature – and as a result, this component of the appellant's argument does not comport with his complaint at trial.[78] To preserve error on appeal, the record must show that the complaint was made to the trial court by a timely request, objection, or motion, and that the trial court ruled on that request.[79] Here, the appellant's objections were to the duplicative prejudicial nature of the photographs; he did not object to the gruesomeness of the photographs that were

---

[76] In his brief, the appellant challenges the trial court's ruling regarding the admission of 20 photographs, including State's Exhibit 140. The trial court sustained appellant's Rule 403 objection to this exhibit and the photograph was not admitted into evidence. Therefore, the appellant's argument regarding State's Exhibit 140 is without merit.

[77] *See* TEX. R. EVID. 403:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[78] *See* TEX. R. APP. PROC. 33.1(a).

[79] TEX. R. APP. PROC. 33.1(a):

"(a) As a prerequisite to presenting a complaint for appellate review, the record must show that:
    (1) the complaint was made to the trial court by a timely request, objection, or motion that:
    (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and
    (B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure; and
    (2) the trial court:
    (A) ruled on the request, objection, or motion, either expressly or implicitly; or
    (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal."

admitted, and therefore, we shall only address the cumulative nature of the exhibits.[80]

It should be noted that, in his brief, the appellant also alleges that he was prejudiced because the State introduced the complained-of exhibits purely to remind the jury that the victim was white and that he was black. He claims that the photographs were "[a] vehicle by which the prosecutors could – and did – get the race factor into the jury room where the testimony couldn't go."[81] He focuses on the color photographs in this argument, returning to a greater theme of racial animosity.[82] We find this argument to be purely speculative. We further note that the State introduced several other autopsy photographs to which he did not object and that he does not now complain were introduced for purely racial purposes. Without more persuasive authority, we shall not entertain this argument.

### A. Settled Law

When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to deciding whether their probative value is substan-

---

[80] The appellant did object to the prejudicial nature of State's Exhibit 140; however, that objection was sustained and the "inflammatory" photograph was never entered into evidence.

[81] At one point, the appellant's argument even bleeds into *Batson* territory, claiming that "the prosecutors used their strikes, when they were forced to, to keep even the most 'ideal' Black juror from taking a seat in the jury box." We have already ruled on the issue of racial discrimination in jury selection and find that this accessory to a 403 objection to be without merit.

[82] Portions of the appellant's brief read as follows: "Because of this particular race-of-the-victim factor – the unique unfair prejudicial effect of admitting the photographs in the circumstances of Appellant's trial, he asks this Court to find that the admission of those photographs was an abuse of discretion. For that same reason – the racial factor that impermissibly permeated the trial, this Court should find that Appellant was harmed by this violation of his substantial rights, under TEX. R. APP. P. 44.2(b) and reverse the conviction.

tially outweighed by the danger of unfair prejudice, confusion of the issues, misleading

the jury, or by considerations of undue delay or needless presentation of cumulative

evidence.[83] The trial court's decision is reviewed under an abuse of discretion standard,

and it may be disturbed on appeal only when the trial court's decision falls outside the

"zone of reasonable disagreement."[84]

A court may consider many factors in determining whether the probative value of

photographs is substantially outweighed by the danger of unfair prejudice. This Court's

opinion in *Long v. State* illustrates the current standard:

> In determining whether the trial court erred in admitting
> photographs in evidence, the controlling factor is whether the
> probative value of the photographs was greatly outweighed by
> their prejudicial effect. The prejudicial effect of the photographs
> may be determined by the number of exhibits offered, their
> gruesomeness, their detail, their size, whether they are black and
> white or color, whether they are close-up, whether the body is
> naked or clothed, and by factors unique to each situation
> photographed.[85]

This list is not exclusive. When determining prejudice, "[t]he availability of other means

of proof and the circumstances unique to each individual case must also be considered."[86]

---

[83] Tex. R. Evid. 403; *Long v. State*, 823 S.W.2d 259, 271 (Tex. Cr. App. 1991), (*citing Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Cr. App. 1991) (op. on reh'g)).

[84] *Montgomery*, 810 S.W.2d, at 391.

[85] *Long*, 823 S.W.2d, at 270.

[86] *Id.*, at 272.

### B. Exhibits

The appellant objected to several exhibits in pairs, arguing that only one of each photograph need be admitted to prove the respective injury. The disputed exhibits were introduced during the testimony of Dr. Stephen Wilson, Assistant Harris County Medical Examiner. He explained that the photographs would help him detail his actions to the jury. All of the photographs were 8 ½ by 11 inches in size and were in color.[87]

### 1. Exhibits 124 and 130

The appellant objected to Exhibits 124 and 130 together as being duplicative, claiming "whatever it is we need to garner from those two photographs, they can be garnered from one as opposed to both." Exhibit 124 is a photo of the victim as she was received by the medical examiner, with her hands bound behind her back and a phone cord wrapped around her neck. Exhibit 130 is a close-up of the victim's face and the ligature around her neck, showing her necklace compressed beneath the ligature. There is a small ruler next to the victim's face that was used to illustrate the actual size of the ligature and its impressions. The Court ruled on these photographs in conjunction with Exhibits 123 and 130 as a pair,[88] overruling the objection. Dr. Wilson later used Exhibit

---

[87] The appellate record contains only black and white copies of the exhibits. We rely upon the State's representation that the actual exhibits presented to the jury are in color. If the appellant believed that the colors in the actual photographs would have made a difference in our assessment of prejudice, it was incumbent upon him to insure that either the original photographs or color copies were included in the record. *See Williams v. State*, 958 S.W.2d 186, 196 n.10 (Tex. Cr. App. 1997). Nevertheless, we deem that the exhibits as provided are sufficient to address the appellant's point of error.

[88] From the record, it appears that Exhibits 123 and 124 are both photographs of the ligature around the

(continued...)

130 to explain the congested features of the victim's face and also to show that the blood vessels beneath her skin were distended. While the photographs were near duplicates of each other, they were sufficiently distinct in magnification and angle to help the witness with his testimony. We find that the court's admission of these two exhibits was proper.

### 2. Exhibits 142 and 155

The appellant also objected to the duplicative nature of Exhibits 142 and 155. Exhibit 142 is photo of the victim's face, illustrating the bruising that resulted from the offense. The victim's eyes and mouth are closed. Exhibit 155 is a close-up of the victim's mouth with the upper lip extended, revealing her upper teeth and showing the bruising to the victim's lower lip, which was not visible in Exhibit 142. Although the appellant argues that other photographs in this series of photographs sufficiently "prove up the bruises to the neck, the face, the lips and the neck," the trial court overruled the objection, stating that "to me, they're dissimilar." We agree with the trial court.

### 3. Exhibits 162 and 163

Exhibit 162 is a photograph of the front and left side of the victim's neck illustrating bruising in the area, while Exhibit 163 is a close-up of the back portion of the same side of her neck with her head turned and hair pulled up, illustrating the severity of the bruising in this area. Dr. Wilson used these photographs to describe the pressure

---

[88](...continued)
victim's neck that aided Dr. Wilson, the expert medical examiner in his testimony. The Court ruled together in 123 and 124, overruling the appellant's duplicative objection.

applied to the victim's neck – most likely by someone's hands – in addition to the ligature strangulation. The trial court noted that, although the photographs were similar, there was no undue prejudice in admitting both. The trial court initially seemed to agree with the appellant, stating that the two photographs "look the same to me. What's the difference?" The State explained their difference:

[State]:     163 shows this portion of the neck and the bruising. This 162 illustrates this part of the neck and the three bruises that appear right there, you can see them. Because the – this picture, the first picture focuses on this portion of the neck, you don't clearly see these – you see these three bruises right here.

[Court]:     Okay. So why not just use 162?

[State]:     Because then you can't see these bruises. Then you can't see very clearly the bruises on the other side of the neck. These come out clearly, but these do not.

[Court]:     All right. In the scheme of things I think 162 and 163 are rather innocuous.

We agree with the trial court and find that the probative value of these photographs outweighs any prejudicial or duplicative effect.

### 4. Exhibits 165 and 166

Exhibit 165 is an extreme close-up of the victim's neck illustrating the contusions and petechial hemorrhages with a ruler present to designate the size of the injured areas. Exhibit 166 is another close-up of bruised areas with a ruler to denote the size of the wounds. Dr. Wilson used the exhibits to describe the size of the wounds as being consistent with fingertip pressure to the victim's neck. The trial court overruled the

objection. We agree with the trial court and find that the probative value of these two exhibits substantially outweighs their cumulative impact.

### 5. Exhibits 167 and 168

Exhibit 167 is a photograph of the right side of the victim's neck displaying several areas of dark bruising. Exhibit 168 is an extreme close-up of several abrasions to the same side of the neck. Dr. Wilson testified that the abrasions were consistent with ligature points and/or the victim's fingernails attempting to remove the ligature. The appellant objected, and again, the trial court overruled the objection. We agree with the trial court.[89]

### 6. Exhibits 174 and 176

Exhibit 174 is a photograph of the victim's neck and chest illustrating the discoloration and bruises to the area. This exhibit also shows the line created by the ligature impression on her neck. Exhibit 176 is a photograph of the same area but shows more of the lower chest area. Dr. Wilson used this exhibit to show the victim's normal skin color versus the color of the skin that was congested with blood caused by strangulation.[90] The trial court overruled the appellant's duplicative objection, and we agree with the trial court.

---

[89] The appellant objected to this pair of photographs in one phrase, without expressly stating that they were duplicative. As a result, it is unknown whether this objection was to the gruesome nature of the photographs. Yet, since the objection was part of a larger pattern of objections and the objection to photographs in pairs were that they were duplicative, we presume that this objection was as well.

[90] The ligature mark is not as visible on this exhibit.

### 7. Exhibits 191 through 193

The appellant specifically argued at trial that the State needed to choose either Exhibits 191 and 192 or Exhibits 192 and 193 to illustrate the victim's head wounds, but not all three. Exhibit 191 shows a close-up of two distinct areas of hematoma to the right side of the victim's skull. Exhibit 192 is a close-up view of the top of the skull illustrating the placement of the wounds on the victim's head. Exhibit 193 shows the bleeding on the scalp itself. Dr. Wilson used these photos to explain the substantial blow to the victim's head. The placement of the wounds is also consistent with the assault described in the appellant's confession. According to the record, the appellant began a general 403 prejudice objection, but later narrowed his objection to "duplicitousness" by the time the trial court ruled.

[Defense]: There is a series of photos beginning at 191 – 191, 192, 193 – 191, 192, and 193 are all photographs of the scalp being there. Obviously, I'm sorry, shows the contusions inside the scalp, under the scalp and under the surface under the surface of the skull. And I believe that 191 and 192 or 192 and 193, they need to pick to have those three. To do otherwise is just going to, is just overwhelming and prejudicial at that point.

[State]: As it relates to 191, 192, 193, the evidence is going to show that she was struck in the head with an object. No. 191 shows the skull and shows the two areas of the skull where there is hematoma. 192 shows the placement of those particular wounds underneath the scalp and the bleeding. 193 shows the bleeding on the – on the skin itself. And then you'll see this is on the skull itself. And this shows the same thing, but placement.

[Defense]: Here's what I – let me be more specific. I'm going to object to 191 duplicitous. Whatever needs to be shown in 191 can be showed–

[Court]: Let me ask that question. What is it that 192 and 3 does not show that 191

does?

[State]:    191 shows –

[Court]:    Again, 192 and 193 does not show.

[State]:    This is 191 is when the skull is refracted and you see these two. Okay. 192 shows the right side toward the back, which is the placement of where this actually occurred. And it's significant because in the defendant's statement, 193 shows the inside so that you can see the bruising, the hemorrhaging here on the scalp itself versus this is the skull itself. And the hematoma and the bleeding that appears on the head.

[Court]:    All right. It's overruled. They're admitted.

While the appellant's argument that the series of photographs would be "overwhelming and prejudicial," its duplicative and prejudicial impact did not substantially outweigh the probative value of the photographs. The trial court overruled the objection, and we agree with the trial court.

### 8. Exhibits 202 and 203 and Exhibits 204 and 205

The appellant also objected to another series of photographs that detail the damage to the hyoid bone. Exhibit 202 displays the thyroid cartilage and the "horn" that protrudes from it. The photograph shows a substantial amount of hemorrhage in the soft tissue, which suggests substantial pressure to the neck. Exhibit 203 is a close-up of the horn showing that it is broken. The appellant complained of these two exhibits together. And finally, the appellant objected to Exhibits 204 and 205 as "duplicitous." Exhibit 204 is a picture of the victim's complete hyoid bone removed from the body, which Dr. Wilson

used to illustrate the substantial neck injury the victim suffered. Exhibit 205 is the close-up of the fractured area of the hyoid exhibiting the extent of the fracture through the bone, which also helped Dr. Wilson in his testimony. When the trial court questioned the State as to why it needed both photographs, the State replied "[o]ftentimes the close-up makes it clearer for the Jury." The trial court promptly overruled the objection and admitted all four photographs together. Again, we agree with the trial court.

## C. Conclusion

The trial court did not err in overruling the appellant's objections to the admissibility of these photographs. The complained-of photographs were not notably duplicative or cumulative, and they served as an aid to Dr. Wilson's explanation of the victim's death and the theories relevant to the State's case. While some of the photos are graphic, they depict the realities of the crime committed.[91] And, although some of the photos reflect substantial changes of the victim's body due to the autopsy procedures, these were fully explained to the jury as necessary to complete a thorough examination of the injuries.

The probative value of the photos was not substantially outweighed by any cumulative effect. While prejudice may be affected by the number of exhibits offered, in this case, there was a substantial amount of photographs illustrating the victim

---

[91] *See Narvais v. State.* 840 S.W.2d 415, 429-30 (Tex. Cr. App. 1992), (*citing Long*, 823 S.W.2d at 273) ("Most significantly, the photographs, although gruesome, merely depict the gruesomeness of the crime scene as found by the police. Although a crime scene may be gruesome, 'that fact alone will not [necessarily] render the probative value of [photographic] exhibits [of the crime scene] substantially outweighed by any prejudicial effect.'").

immediately after the offense, just prior to the autopsy, and during the autopsy. Each of these exhibits aided in the testimony given to the jury, providing probative value to the proffered expert testimony, and to the jury's ultimate determination of guilt.

We find that the trial judge committed no abuse of discretion in allowing these photographs into evidence. Point of error eleven is overruled.

## V. MITIGATION EVIDENCE

The appellant complains on appeal that several records were improperly excluded during the trial that would have aided the jury in determining his punishment.

### A. Hospital and School Records

In point of error eight, the appellant contends that the trial court erred at the punishment phase of the trial in sustaining the State's objection to the admission of three defense exhibits consisting of hospital and school records. Specifically, he argues that the exhibits were constitutionally-relevant, self-authenticating business records that should have been admitted, and that their omission violated his due process right to present mitigating evidence.

### 1. Background

After the State rested its punishment case, the appellant moved to have three school and hospital records entered into evidence as business records.[92] Under the Texas Rules of Evidence, Rule 803(6) is an exception to the hearsay rule. It allows records of

---

[92] The contested exhibits are Defense Exhibits 9, 10, and 11, which are the records from Assumption Parish School, LaFourche Parish School, and Mandeville State Hospital, respectively.

regularly conducted activity, more commonly known as business records, to be admitted if it can be shown that the records were made at or near the time of the event, recorded by someone with knowledge, and that it was common practice to keep such a record in the course of regularly-conducted business.[93] This can be shown through the testimony of the custodian or other qualified witnesses, or by an affidavit that complies with Rule 902(10).[94] The appellant employed Rule 902(10) and submitted the contested records with a verified affidavit; however, he did so without complying with the rule's 14-day notice requirement.[95] The State objected that the records were hearsay because the appellant did not comply with Rule 902(10). The appellant did not ask for a continuance to either meet Rule 902 or to bring the custodians of the records as witnesses under Rule 803(6), and thus, the trial court sustained the State's objection and excluded the records.

## 2. Analysis

When reviewing a trial judge's decision to admit or exclude evidence, an appellate

---

[93] TEX. R. EVID. 803(6):

The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

[94] TEX. R. EVID. 803(6).

[95] The appellant confesses to his failure to supply the records within the time allowed by the rules, stating, "We're asking to let these in in front of the business – as business records affidavit, although they weren't filed under the business records statute."

court must determine whether the judge's decision was an abuse of discretion.[96] Unless the decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling.[97] Rule 902(10) requires, in pertinent part, that if a party chooses to verify hearsay business records by affidavit, that party must file the records with the court and notify the opposing party at least fourteen days prior to trial. The notice period allows the other party time for inspection. Because a sponsoring witness will not be present at court, the inspection period allows the opposing party the opportunity to review the affidavit and proffered records for any problems or concerns that need be addressed before trial.

The appellant argues that, because his evidence meets the threshold for constitutionally-relevant mitigating evidence under *Tennard v. Dretke*,[98] the records were *per se* admissible based on his Fourteenth Amendment and Eighth Amendment protections, regardless of Rule 902(10). He suggests that the test for constitutional relevance, as discussed in *Tennard*, should apply, in which constitutional relevancy is determined by whether "[r]easonable jurists could conclude that . . . [evidence of significant impairment in intellectual function is evidence that] might serve 'as a basis for

---

[96] *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Cr. App. 2002).

[97] *Id.*

[98] 542 U.S. 274 (2004) (holding that evidence of low IQ scores was constitutionally relevant evidence for mitigation in a death penalty case because reasonable jurists could have concluded that the evidence was relevant mitigating evidence).

a sentence less than death.'"[99] Relying heavily on the United States Supreme Court cases of *Chambers v. Mississippi*[100] and *Holmes v. South Carolina,*[101] he contends that the Fourteenth Amendment's due process right to present a defense is not a right to be defeated by the "mechanistic" and "arbitrary" application of what may otherwise be "legitimate" rules of evidence, notably the procedural elements of Rule 902(10).

This Court has previously held, in *Renteria v. State*,[102] that the United States Constitution does not require admission of mitigating evidence when it is inadmissible under state law, even when the evidence meets the test of "constitutional relevancy."[103] Although Texas and the United States Supreme Court have established jurisprudence that no person shall be executed without the opportunity to bring all evidence of mitigating circumstances, the United States Constitution does not *require* the admission of evidence if it is in a form that is otherwise objectionable.[104] In other words, relevant evidence must be presented in a form that is acceptable to the laws of evidence of the State in order to be received over objection.[105] The Supreme Court's decision in *Tennard* does not alter

---

[99] *Id.*, at 288, (*citing Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)).

[100] 410 U.S. 284 (1973).

[101] 547 U.S. 319 (2006).

[102] 206 S.W.3d 689 (Tex. Cr. App. 2006).

[103] *Renteria*, 206 S.W.3d, at 697; *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Cr. App. 1991); *see also Tennard*, 542 U.S., at 283.

[104] *Renteria*, 206 S.W.3d, at 697; *see also Lewis*, 815 S.W.2d, at 568.

[105] *Id.*

this,[106] and neither do *Chambers* and *Holmes*.

In *Chambers*, the appellant's defense was thwarted by two separate state evidentiary rules. Chambers was arrested and tried for murder, maintaining his innocence for the duration of the trial, and asserted that Gable McDonald, a witness, was the actual killer. McDonald confessed to the murder in question to three separate individuals on numerous occasions. McDonald's statements were admissions against his penal interest – a common exception to the hearsay rule,[107] and they were corroborated by other evidence in the case. Furthermore, McDonald, the third-party was present in the courtroom, under oath and subject to cross-examination.[108] The State of Mississippi, however, did not recognize the "admission against penal interest" exception to the hearsay rule; as a result, the trial court refused to allow the defendant to introduce the testimony of the three persons to whom the confessions were made.[109] The second evidentiary barrier to the appellant was Mississippi's "voucher" rule, which prevented the defendant from being able to cross-examine the third-party witness (whom the defendant called because the State failed to do so), as it did not allow Chambers to impeach his own witness.[110] The Supreme Court repudiated the voucher rule and held that Chambers' due process was

---

[106] *Renteria*, 206 S.W.3d, at 697.

[107] *Chambers*, 410 U.S., at 298-99.

[108] *Id.,* at 300-01.

[109] *Id.,* at 299.

[110] *Id.,* at 295-96.

denied, stating that "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process."[111]

*Chambers* is distinguishable from the present case for several reasons. First, the Supreme Court has stated that *Chambers* does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence, as is the issue in the case at bar.[112] In *Chambers*, the Court found error only because the evidence "bore persuasive assurances of trustworthiness" and thus was "well within the basic rationale of the exceptions for declarations against interest."[113] In other words, the Court held that the evidence was admissible because it did meet evidentiary rules; the problem was that Mississippi had not yet adopted those rules. Second, the evidentiary rules in the instant case are not the same substantively or procedurally as they were in *Chambers*. The rule in *Chambers* focused on declarations against interest for hearsay statements from the accused or witnesses, while the instant rule provides procedural guidelines specifically for business records with respect to inspection and preparation. No amount of inspection would change the fundamental principle of the Mississippi law. Third, the issue in *Chambers* was part of the guilt and

---

[111] *Id.*, at 302.

[112] *See United States v. Scheffer*, 523 U.S. 303, 316-17 (1998); *Valle v. State*, 109 S.W.3d 500, 506 (Tex. Cr. App. 2003).

[113] 410 U.S., at 302.

innocence section of the trial, while the issue in the present case is for punishment only.

In summary, we find that the appellant reads *Chambers* too broadly for it to apply to this case.[114]

Similarly, in *Holmes*, the appellant's defense to a murder charge was precluded by an evidentiary rule. Holmes was charged with murder, first-degree criminal sexual conduct, first-degree burglary, and robbery, and was sentenced to death. While the State had substantial forensic evidence connecting the appellant to the offense, the appellant "attempted to undermine the State's forensic evidence by suggesting that it had been contaminated and that certain law enforcement officers had engaged in a plot to frame him."[115] He also sought to introduce proof that a third-party was actually responsible for the murder, including the testimony of several witnesses who provided an alibi and even one who admitted to committing the offense. The trial court denied this evidence based on state precedent precluding admissibility of third-party guilt evidence unless it raises a reasonable inference of the defendant's innocence.[116] The United States Supreme Court held that "this Court's cases contain several illustrations of 'arbitrary' rules, i.e., rules that

---

[114] *Chambers*, 410 U.S., at 302-03 ("In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.").

[115] *Holmes*, 547 U.S., at 322.

[116] *Holmes*, 547 U.S., at 323-24 (*citing State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941)).

excluded important defense evidence but that did not serve any legitimate interests."[117] The Court noted that the due process right was offended by rules that are "arbitrary" or "disproportionate" to the purposes they are designed to serve, such as rules that exclude important defense evidence but do not serve any legitimate interests.[118]

In the instant case, the Texas evidentiary rules requiring the authentication of proffered hearsay evidence are not "arbitrary or disproportionate," as they serve the legitimate purpose of assuring the trustworthiness of the evidence.[119] The procedural requirement is expressly applied without any sense of arbitrariness. It is a bright-line rule that is: (1) established by the Texas Rules of Evidence and not common-law precedent, (2) procedural and not substantive, and (3) applied uniformly. For this Court to find the 14-day rule "arbitrary," we would be forced to apply it erratically, choosing haphazardly what cases need to comply with established limits and which do not. We will not entertain such a notion. As a result, *Holmes* is likewise inapplicable to the appellant.

Having found that *Chambers* and *Holmes* are distinguishable from the present case, we return to the rules of evidence. Quite simply, the appellant did not comply with either Rules 803(6) or 902(10) to establish the authenticity of the proffered records.

---

[117] *Holmes*, 547 U.S., at 323.

[118] *Id.,* at 331("The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is 'arbitrary' in the sense that it does not rationally serve the end that the *Gregory* rule and other similar third-party guilt rules were designed to further.").

[119] *See* TEX. R. EVID. 803(6); *see generally Saavedra v. State*, 297 S.W.3d 342, 347 (Tex. Cr. App. 2009).

Although he did supply an affidavit with these business records, he failed to do so within the statutory 14 day limit. He cannot now rely on the fundamental protections of due process to cure his preventible error. Because of this, we find that the trial court did not abuse its discretion by declining to admit the records over the State's well-founded objection. Point of error eight is overruled.

## B. Videotaped Interview

In point of error nine, the appellant objects that the trial court erred by not allowing him to present a 41-minute videotaped interview of his mother, Ms. Ester Mae Smith, addressing various aspects of his childhood, schooling, and hospitalization.

### 1. Background

The appellant attempted to admit the videotaped interview of his mother along with the three previously discussed business records during the punishment phase of his trial.[120] The State objected to the admission of the tape on hearsay grounds since it would not have an opportunity to cross-examine the witness. The appellant explained that his mother was not in attendance at trial for two reasons: (1) she had "health issues," and (2) "she doesn't want to come up here and release the family secrets." The State replied that "we'd object to the admission of a videotape of a witness that we don't have the chance to cross-examine." The trial court sustained the State's objection and excluded the tape. On appeal, the appellant admits that the videotaped testimony is hearsay, but relies on the

---

[120] The trial court ruled on the complained-of evidence of the appellant's eighth and ninth points of error together.

same legal argument as his eighth point of error. Again, he contends that his Fourteenth Amendment due process right to present evidence and his Eighth Amendment right to present constitutionally-relevant mitigating evidence should trump the evidentiary hearsay rules.

## 2. Analysis

When reviewing a trial judge's decision to admit or exclude evidence, an appellate court must determine whether the trial judge's decision was an abuse of discretion.[121] Again, unless the trial judge's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling.[122]

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[123] Hearsay statements are generally inadmissible, unless they fall into one of the exceptions in Rules 803 and 804.[124]

Here, the record shows that appellant failed to argue – either at trial or on appeal – that any exception to the hearsay rule applies in this case. Instead, he attempted to circumvent established evidentiary law to invoke his constitutional rights to present relevant evidence of mitigation. As previously established, "[a] defendant's right to

---

[121] *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Cr. App. 2002).

[122] *Id.*

[123] TEX. R. EVID. 801(d).

[124] TEX. R. EVID. 802.

present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."[125] We believe such reasonable restrictions include state evidentiary laws.[126] Moreover, this Court has previously held that the United States Constitution does not require admission of mitigating evidence when it is inadmissible under state law, even when the evidence meets the test of "constitutional relevancy."[127] This Court has also held that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"[128]

In this case, we note that the videotaped testimony does not fall under any of the hearsay exceptions listed in Rules 803 or 804. Further, the appellant offered no argument in support of any hearsay exception, relying solely on his constitutional rights to due process of law. Even assuming that the exclusion of this evidence was erroneous under state law, we find that there was no constitutional error unless the evidence formed such a vital portion of the case that its exclusion effectively precluded the defendant from

---

[125] *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Cr. App. 2002).

[126] *See Renteria*, 206 S.W.3d, at 689.

[127] *Id.*, 206 S.W.3d, at 697.

[128] *Potier*, 68 S.W.3d, at 659.

presenting a defense.[129] The appellant was not prohibited from presenting a defense in the form of mitigation testimony; nor was he prohibited from introducing defense witnesses. Testimony was elicited from the appellant's punishment witnesses concerning his stay at the Mandeville State Hospital, his problems concerning his education, and his lack thereof. Defense witness Jennifer McIntyre provided details about the appellant's childhood, his schooling, the abuse he suffered, and the conditions in which he was raised. McIntyre testified to his running away from home, his subsequent homeless life under a bridge, and his time at the state hospital. Harris County Deputy Willie Drew testified to the appellant's suicide attempt in jail.

While the videotape of the appellant's mother may be relevant to the mitigation special issue, the exclusion of this evidence does not amount to a denial of his constitutional right to present mitigating evidence because the exclusion of the evidence was not "unconstitutionally arbitrary or disproportionate."[130] In fact, a vast amount of the same evidence came in through other witnesses and in different form, specifically through the testimony of McIntyre.[131] The fact that the appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented

---

[129] *Id.*, at 663; *see also Valle*, 109 S.W.3d, at 506.

[130] *Potier,* 68 S.W.3d, at 659.

[131] *See id*. We acknowledge that the evidence as admitted does not convey the identical evidence, as it would have been viewed through the videotaped interview with the appellant's mother. Yet this slight variance (a) does not change the fact that much of the same testimony was presented to the jury through these other witnesses, and (b) rise to due process violation.

from presenting the substance of his defense to the jury. Point of error nine is overruled.

## VI. DEFINITION OF "SOCIETY"

In his tenth point of error, the appellant complains that the trial court failed to provide a proper definition of "society" within the future dangerousness special issue, in violation of his rights under the Eighth and Fourteenth Amendments. Specifically, he argues that the trial court should have limited the jury's consideration of "society," so that it should be used in the context of "prison society." This Court has consistently held that terms such as "society" and "continuing threat to society" require no special definition.[132] Further, the appellant has not provided us with a reason to revisit the issue under these circumstances.[133] Point of error ten is overruled.

We affirm the judgment of the trial court.

Delivered September 29, 2010.
Do not publish.

---

[132] *Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Cr. App. 2007); *see also Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Cr. App. 2003); *Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Cr. App. 1994).

[133] We wish to note that the venire panel was informed that the term "society" includes "prison society" during voir dire, and all of the chosen jury members stated that they understood.